# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK URIARTE, RUDY ALARCON, LUIS CASILLAS, STEVEN GARCIA, GERMAN DURAN, GABRIEL RODRIGUEZ, ISAIAS NAVARRO, and STEPHEN FRAZIER,<br><br>                              Plaintiffs,<br>v.<br>MICHAEL BOSTIC, CITY OF CALEXICO, RICHARD WARNE, and GONZALO C. GERARDO,<br><br>                              Defendants. | Case No.: 15cv1606-MMA (PCL)<br><br>**ORDER DENYING UNOPPOSED MOTION TO STAY**<br><br>[Doc. No. 62] |

Before the Court is Defendants' motion to stay the proceedings pending resolution of parallel state administrative proceedings initiated by the seven terminated plaintiffs to challenge the propriety of the City of Calexico's decision to terminate their employment. Doc. No. 62 ("Mtn"). Plaintiffs filed a notice of non-opposition to Defendants' motion. Doc. No. 63. The Court found the matter suitable for determination on the papers and took the matter under submission pursuant to Civil Local Rule 7.1.d.1. For the reasons set forth below, the Court **DENIES** Defendants' unopposed motion to stay.

//

## BACKGROUND

On November 22, 2016, Plaintiffs Frank Uriarte, Rudy Alarcon, Luis Casillas, Steven Garcia, German Duran, Gabriel Rodriguez, Isaias Navarro, and Stephen Frazier (collectively, "Plaintiffs") filed the operative Second Amended Complaint ("SAC") against Defendants Michael Bostic, Richard Warne, Gonzalo C. Gerardo, and the City.[1] Doc. No. 39.

Plaintiffs are or were police officers employed by Defendant City during the events alleged in the SAC. SAC ¶ 4. At all relevant times, Defendant Bostic was the chief of police for Defendant City and the Calexico police department, and Defendant Warne was the city manager. SAC ¶¶ 6-7. Defendant Gerardo was and is a police lieutenant for the City and the police department. SAC ¶ 8.

Prior to November 2014, Plaintiff Alarcon served as the President of the Calexico Police Officer's Association ("CPOA"), Plaintiff Casillas served as the Vice President of the CPOA, and Plaintiffs Uriarte, Garcia, Duran, and Navarro were members of the CPOA Executive Board. SAC ¶ 13. Plaintiff Frazier was not an Executive Board member, but "was widely known to be closely associated with such leadership and aligned with [the leaders'] views and actions." *Id.* Plaintiffs and the CPOA were politically active. *Id.* Plaintiffs participated in local elections, endorsed and opposed candidates, and would routinely speak out at City Council Meetings. SAC ¶ 14. Plaintiffs Alarcon, Casillas, Duran, and Rodriguez frequently spoke about public matters, voiced their opinion on matters of public opinion, were interviewed by press and media outlets, engaged in fundraising events, and made radio announcements. *Id.* Plaintiffs used these forums to publically denounce incumbent City Council Member Martiza Hurtado and her election in 2010 and re-election in 2014. *Id.* Prior to the November 2014 City Council election, Plaintiffs and the CPOA "actively opposed" the re-election

---

[1] Joseph Bielma, who was listed as a plaintiff in the original complaint, and Maritza Hurtado, who was listed as a defendant in the original complaint, are omitted from the operative SAC.

of Hurtado and opposed the election of "another."  SAC ¶ 21.  Plaintiffs went to City Council meetings in their CPOA shirts, and Plaintiffs Casillas, Alarcon, and Garcia spoke out against Defendant Hurtado's re-election.  *Id.*

"Around this same time, Hurtado . . . began to engage in retaliatory actions."  SAC ¶ 23.  Plaintiffs allege that Hurtado told Plaintiffs that it was not their place to be involved in collective bargaining negotiations or political campaigns.  *Id.*  She and other individuals said they were going to "break the union," "charge" Plaintiffs, and have them terminated.  *Id.*  They accused CPOA members of being corrupt and of stealing money.  *Id.*  Hurtado then "employed Bielma to attend a covert meeting at the residence of a criminal suspect that . . . [Plaintiffs] had arrested . . . ."  SAC ¶ 24.  Hurtado allegedly employed Bielma to solicit a complaint from the individual contending that Plaintiffs, specifically CPOA president Plaintiff Alarcon, engaged in excessive force.  *Id.*  Plaintiffs allege that Hurtado was retaliating against Plaintiffs' "speech activities outlined in this complaint."  *Id.*

Plaintiffs allege that Defendant City subsequently hired an investigator to investigate the Police Department "with the hopes of digging up any dirt" on Plaintiffs that could be used as grounds for terminating employment.  SAC ¶ 25.  Plaintiffs contend that the investigation was too wide-ranging, and that Plaintiffs were not adequately notified of its scope and nature.  *Id.*  During the investigation, "the officers were questioned about their protected political activities, clearly demonstrating that these were reasons behind the investigation."  *Id.*

In the 2014 election, Hurtado and the other candidate that Plaintiffs opposed were elected to City Council.  SAC ¶ 27.  By the time of the election, Defendant City had hired Defendant Warne as an interim city manager to "attack[] the CPOA and [Plaintiffs.]"  SAC ¶ 28.  Defendant Warne was "hand selected by Hurtado."  *Id.*  Defendant Warne then fired the chief of police "because he was perceived to be pro-cop, and because he had a positive relationship with the CPOA."  *Id.*  Defendant Warne then hired Defendant

Bostic to be the chief of police. SAC ¶ 29. Defendant Bostic stated that Hurtado and Warne hired him to clean up the Police Department. *Id.*

At a November 19, 2014 press conference, Defendant Bostic stated that some City Council members and members of the CPOA have been using city funds and resources to run an "extortion racket." SAC ¶ 31. He stated that some members of the prior investigation unit of the police department spent thousands of dollars on surveillance equipment. SAC ¶ 33. When questioned, the investigations unit reported to Bostic that they had no current investigations. *Id.* Defendant Bostic stated that the CPOA and Council Members were "using all this equipment to go around tracking, voice recording, taking pictures, trying to get them in compromising positions: Like the Mafioso of New York." SAC ¶ 34. He stated that they were attempting to clean up the mess caused by the former Chief and former staff. SAC ¶ 33. Plaintiffs allege these statements are false because the CPOA "has never extorted anyone, and has never gone [sic] engaged in any tracking, voice recording, or taking pictures for the purpose of extorting." SAC ¶ 35. "No members of the CPOA have purchased surveillance equipment after Bostic took office." *Id.* The officers were working on a multitude of cases and Defendant Bostic knew that. *Id.*

Between December 2014 and July 2015, Plaintiffs Uriarte, Alarcon, Casillas, Garcia, Duran, Rodriguez, and Frazier were each allegedly fired for "innocuous, petty mistakes" that "do not justify termination." SAC ¶ 40. The SAC also states that the excessive force allegation "involving Plaintiff Alarcon" served as the basis for the "alleged termination of various of the Plaintiff[s]." SAC ¶¶ 24, 40. Plaintiff Navarro "has been subject to a retaliatory investigation." SAC ¶ 52.

In July 2015, Bielma, "previously a confidant and supporter of Defendants, . . . blew the whistle to the Department of Justice by making a written complaint of corruption against Bostic and Warne." SAC ¶ 42. Bielma's complaint states that Defendants Bostic and Gerardo recommended that an officer named Acuna take over as CPOA President, as Plaintiff Casilla's employment had been terminated. SAC ¶ 43.

Bielma's complaint states that Defendants Bostic and Gerardo intimidated and coerced Acuna to lie regarding the excessive use of force charges against Plaintiff Alarcon. SAC ¶ 45. Defendants Bostic and Gerardo allegedly believed Acuna was untruthful during the initial investigation regarding the excessive force claims. SAC ¶ 46. Accordingly, they believed they had to fire Acuna because otherwise "Alarcon and the other Plaintiff[s] here, could demonstrate disparate [sic] between firing them and not firing Acuna." *Id.* "After all, the allegations made against Acuna were similar to the allegations made against the involved Plaintiff[s]." *Id.* According to Bielma, Defendants Bostic and Gerardo conspired to fire Acuna, tell Acuna to request a Skelly hearing before Defendant Bostic, and have Acuna lie during the hearing.[2] *Id.* Acuna was to say he was previously not truthful during the investigation because he was intimidated "by the prior police administration and the Plaintiff[s]." *Id.* He was supposed to say that he saw Plaintiff Alarcon use excessive force. *Id.* Defendants Bostic and Gerardo told Acuna that doing so would save his job. *Id.* "The allegations in Bielma's complaint came to happen." SAC ¶ 50. Acuna was served with termination papers and he requested a Skelly hearing. *Id.* Defendants Gerardo and Bostic have harassed and intimidated Bielma by threatening to prosecute him because they wish to "keep him from disclosing the [information contained in this complaint to the Department of Justice]." SAC ¶ 52.

The SAC alleges First Amendment retaliation pursuant to 42 U.S.C. § 1983, violations of the MMBA pursuant to California Government Code sections 3502 and 3506, defamation, and false light. *See* SAC. On May 26, 2017, the Court dismissed with prejudice Plaintiffs' claims premised on violations of the MMBA and struck Plaintiffs' defamation and false light claims. Doc. No. 50 at 16, 29.

---

[2] The term "Skelly hearing" derives from *Skelly v. State Personnel Board*, 539 P.2d 774 (1975), which held that public employees have property interests in their continued employment for due process purposes. *Cason v. San Diego Transit Corp.*, No. 10CV0098-IEG (MDD), 2011 WL 1596315, at *2 n.1 (S.D. Cal. Apr. 25, 2011). "A Skelly hearing is a pre-disciplinary, administrative hearing, during which a public employee has an opportunity to present his version of relevant events." *Id.*

## LEGAL STANDARD

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005); *Holder v. Holder*, 305 F.3d 854, 867 (9th Cir. 2002). "Generally, as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the [f]ederal court having jurisdiction . . . .'" *Colo. River*, 424 U.S. at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)); *see also Seneca Ins. Co. v. Strange Land Inc.*, 862 F.3d 835, 841 (9th Cir. 2017).

Nonetheless, federal courts are authorized to dismiss or stay an action "due to the presence of a concurrent state proceeding for reasons of wise judicial administration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983) (quoting *Colo. River*, 424 U.S. at 818). In considering whether to do so, the court is tasked with ascertaining "whether there exist 'exceptional' circumstances, the 'clearest of justifications,' . . . to justify the *surrender* of [federal] jurisdiction." *Id.* at 25-26 (emphasis in original); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 912 (9th Cir. 1993) ("Only exceptional circumstances justify such a stay, and whether these circumstances exist is determined by weighing a complex of factors."). Accordingly, the court considers the following factors in determining whether to grant such a stay:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*R&R St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79 (9th Cir. 2011); *see also Seneca Ins. Co.*, 862 F.3d at 842. If "there exists a substantial doubt as to whether the state court

proceeding will resolve all of the disputed issues in [the federal] case, it is unnecessary for [the court] to weigh the other factors included in the *Colorado River* analysis." *Intel Corp.*, 12 F.3d at 913 n.7. The Ninth Circuit explained that:

> Under the rules governing the *Colorado River* doctrine, the existence of a substantial doubt as to whether the state proceeding will resolve the federal action precludes the granting of a stay . . . . "When a district court decides to . . . stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. *If there is any substantial doubt as to this*, it would be a serious abuse of discretion to grant the stay or dismissal at all . . . . Thus, the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses."

*Id.* at 913 (internal citations omitted); *see also Smith*, 418 F.3d at 1033 (9th Cir. 2005). Regardless, "the decision whether to [stay] a federal action because of a parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16; *see also Seneca Ins. Co.*, 862 F.3d at 842; *Intel Corp.*, 12 F.3d at 912.

## DISCUSSION

The Court finds there to be substantial doubt as to whether the state administrative proceedings will resolve all the issues presented in this federal action. Defendants contend that there are seven state administrative proceedings currently pending, which were initiated by the seven terminated Plaintiffs in this action. Mtn at 2. However, there are eight Plaintiffs listed in the SAC, which necessarily means that at least one Plaintiff's claims will not be resolved. *See* SAC. Further, the Court is not convinced that the state administrative proceedings will resolve Plaintiffs' First Amendment retaliation claims pursuant to 42 U.S.C. § 1983. Based on the motion, the Court can determine that Plaintiffs are "challenging the propriety of the City's decision to terminate" seven of the Plaintiffs in this action and that through these state proceedings, Plaintiffs "have the opportunity to present evidence and argument to an impartial adjudicator with the

7

opportunity to reverse their terminations and recover backpay [sic]." Mtn at 3-4. This potential resolution does not necessarily address the alleged constitutional violations suffered by Plaintiffs. Even further, Defendants concede that four of the seven proceedings have already "rendered decisions" in favor of the City. *Id.* at 2, 5. However, the parties have taken no action to dismiss claims raised by those Plaintiffs in the instant federal action. *See* Docket. Accordingly, "there exists a substantial doubt as to whether the state court proceeding will resolve all of the disputed issues in [the federal] case, [and] it is unnecessary for [the court] to weigh the other factors included in the *Colorado River* analysis. *Intel Corp.*, 12 F.3d at 913 n.7.

Nonetheless, consideration of the other factors also does not weigh in favor of granting the requested stay. "[T]he dispute does not involve a specific piece of property," and so the first factor is irrelevant in this case. *See R.R. St. & Co.*, 656 F.3d at 979. The Court assumes that the state administrative proceedings are occurring within the City of Calexico, which is within this judicial district. Thus, the second *Colorado River* factor is also "irrelevant in this case because . . . both the federal and state forums are located in [the same geographic area]." *See id*.

Plaintiffs initiated their state proceedings prior to initiating the instant federal action and there has been no showing that exercise of jurisdiction by this court would promote forum shopping. Mtn at 4. Thus, these two factors weigh slightly in favor of the Court granting the requested stay. However, as previously discussed, the Court is not convinced that all the issues in the two actions are the same and there exists a legitimate concern whether the state administrative proceedings are adequate to protect the rights of the litigants in this action. Additionally, federal law provides the rule of decision on the merits of Plaintiffs' § 1983 claims. Further, while avoiding piecemeal litigation is certainly a desirable goal, "[a] general preference for avoiding piecemeal litigation is insufficient to warrant abstention" and "[a]ny case in which *Colorado River* is implicated will inevitably involve the possibility of 'conflicting results, piecemeal litigation, and some duplication of judicial efforts,' which are the 'unavoidable price of preserving

8

15cv1606-MMA (PCL)

access to . . . federal relief." *Seneca Ins. Co.*, 862 F.3d at 842 (9th Cir. 2017). These three factors weigh in favor of denying the requested stay.

In short, after considering all of the relevant factors, this Court is not persuaded that exceptional circumstances and the clearest of justifications have been established justifying the granting of a stay. *See Seneca Ins. Co.*, 862 F.3d at 847.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' unopposed motion to stay proceedings pending resolution of Plaintiffs' state administrative proceedings and **ORDERS** the parties to jointly contact Magistrate Judge Peter C. Lewis within five days to schedule a Case Management Conference.

**IT IS SO ORDERED**.

Dated: December 6, 2017

Hon. Michael M. Anello
United States District Judge